James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Scott A. Bursor
Joseph I. Marchese
BURSOR & FISHER, P.A.
888 Seventh Avenue
New York, New York 10019
(212) 989-9113

Antonio Vozzolo
Courtney E. Maccarone
FARUQI & FARUQI, LLP
369 Lexington Avenue, 10th Floor
New York, New York 10017
(212) 983-9330

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN GAUL, BARBARA BROKING, KIRSTEN ARENTZEN, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> BAYER HEALTHCARE, LLC, <br><br> Defendant. | Civil Action No. 12-5110(SRC)(CLW) <br><br> **FIRST AMENDED COMPLAINT and <u>DEMAND FOR JURY TRIAL</u>** |

Plaintiffs John Gaul, Barbara Broking, and Kirsten Arentzen, by their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action against Bayer HealthCare, LLC ("Bayer" or "Defendant") for falsely labeling Citracal Slow Release 1200 ("Citracal SR") with claims that state or imply that it provides the recommended amount of calcium with one daily dose.  The human body can only absorb a small amount of calcium at once, which is why every calcium supplement on the market recommends twice-daily dosing to enable efficient absorption of calcium into the body. Citracal SR is the first calcium supplement to offer 1,200 mg of calcium with recommended once-daily dosing.  Bayer claims Citracal SR provides efficient once-daily dosing because it delivers a slow steady release of calcium to maximize absorption.  Specifically, the Citracal SR label states:

(1)     "Breakthrough for Unsurpassed Absorption"

(2)     "Slowly & continuously releases calcium for efficient absorption"

(3)     "Take just once daily"

(4)     "Slo-Cal technology is a breakthrough, patent-pending technology that has been specifically developed and researched to provide <u>efficient</u> calcium absorption **in just one daily dose**" (underlining and bold in original label)

(5)     "Research suggests that the best way to take calcium is in small, easily absorbable amounts but most calcium supplements don't work this way.  **Citracal Slow Release 1200** contains Slo-Cal Technology, a patent pending technology which slowly releases the calcium for <u>efficient</u> absorption." (underlining and bold in original label)

(6)     "And because of the Slo-Cal Technology, you only have to take it once per day for your full daily dose."

These statements appear directly on Citracal SR's label and packaging.

2.     Each of these statements is false and misleading.  In fact, recent studies have demonstrated that calcium carbonate, the largest source of calcium in Citracal SR, has much lower rates of absorption and bioavailability than calcium citrate.  Moreover, Bayer's "Slo-Cal™ Technology" is inherently flawed, because when the body's calcium channels become saturated in the presence of continuous calcium, the body produces an inhibitory feedback mechanism that actually *prevents* further uptake of calcium.  The "slow release" nature of Citracal SR actually *impedes* calcium absorption.  Furthermore, Bayer's own Pharmacokinetic Study proves that Citracal SR is substantially less effective than competing supplements.  Thus, Citracal SR is worthless because it does not provide the recommended amount of calcium (1,200 mg) in a single daily dose, as advertised.

3.     Bayer's false labels on Citracal SR injure purchasers in at least two ways.  First, because the once-daily dosing is touted as a key advantage that is unique to Citracal SR and distinguishes it from other calcium supplements, Citracal SR sells at price premium over competing calcium supplements.  The price premium is approximately 100%, as Citracal SR is roughly double the price per milligram when compared to twice-daily calcium supplements.  Second, purchasers are also injured because Citracal SR is ineffective for its intended purpose.  Most of the calcium it purports to deliver cannot be absorbed by the body.  So purchasers are hit with a costly double-whammy:  they pay double the price for an inferior and ineffective product.

4.     Plaintiffs John Gaul, Barbara Broking, and Kirsten Arentzen are purchasers of Citracal SR who thought they were getting a "breakthrough" product that provided "unsurpassed absorption" and "efficient calcium absorption **in just one daily dose**."  Because that is what the Citracal SR label said.  They paid a substantial price premium to get those important benefits, but they received an ineffective and worthless product that did not provide a full daily dose of

calcium. They assert claims for unjust enrichment, breach of express and implied warranties, and violation of the New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1, *et seq*., on behalf of themselves and similarly situated purchasers of Citracal SR.

## THE PARTIES

5.      Plaintiff John Gaul is a citizen of the State of New Jersey. Plaintiff Gaul purchased Citracal SR for his personal use at CVS and Walgreens pharmacies in Bergen County, New Jersey beginning in July of 2011. Plaintiff Gaul saw and read the representations on Citracal SR's label prior to and at the time of purchase, and understood them as a representation and warranty by Bayer that Citracal SR provided efficient absorption of an entire day's recommended level of calcium in one serving or dose and that the product would the provide an equivalent amount of calcium to other products which require two daily doses. He relied on these representations and warranties in deciding to purchase Citracal SR, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased Citracal SR if he had known that it would not, in fact, provide efficient absorption of an entire day's recommended level of calcium in one serving or dose and that Citracal SR would not provide an amount of calcium equivalent to that provided by other products which require two daily doses. He also understood that in making the sale, the retailer was acting with the knowledge and approval of Bayer and/or as the agent of Bayer. Furthermore, Plaintiff Gaul was injured because he paid a premium price for the slow release feature of Citracal SR over comparable twice a day products that provide greater levels of bioavailable calcium. In return, he received an ineffective and worthless product which did not provide him with a full day's supply of calcium in one daily dose and did not, when used as directed, provide an amount of absorbable calcium comparable to other twice-daily calcium supplements. The amount of the price premium can be reasonably quantified by an appropriate market study of the prices for

4

comparable calcium supplements, or through a contingent valuation study, or through other means regularly employed by economic and valuation experts.

6.     Plaintiff Barbara Broking is a citizen of the State of New Jersey.  Plaintiff Broking purchased Citracal SR for her personal use at a K-Mart retailer in Bergen County, New Jersey in July of 2012.  Plaintiff Broking saw and read the representations on Citracal SR's label prior to and at the time of purchase, and understood them as a representation and warranty by Bayer that Citracal SR provided efficient absorption of an entire day's recommended level of calcium in one serving or dose and that the product would the provide an equivalent amount of calcium to other products which require two daily doses.  She relied on these representations and warranties in deciding to purchase Citracal SR, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased Citracal SR if she had known that it would not, in fact, provide efficient absorption of an entire day's recommended level of calcium in one serving or dose and that Citracal SR would not provide an amount of calcium equivalent to that provided by other products which require two daily doses.  She also understood that in making the sale, the retailer was acting with the knowledge and approval of Bayer and/or as the agent of Bayer.  Furthermore, Plaintiff Broking was injured because she paid a premium price for the slow release feature of Citracal SR over comparable twice a day products that provide greater levels of bioavailable calcium.   In return, she received an ineffective and worthless product which did not provide her with a full day's supply of calcium in one daily dose and did not, when used as directed, provide an amount of absorbable calcium comparable to other twice-daily calcium supplements.  The amount of the price premium can be reasonably quantified by an appropriate market study of the prices for comparable calcium

supplements, or through a contingent valuation study, or through other means regularly employed by economic and valuation experts.

7.      Plaintiff Kirsten Arentzen is a citizen of the State of New Jersey.  Plaintiff Arentzen purchased Citracal SR for her personal use at a Rite-Aid pharmacy in Mercer County, New Jersey on March 18, 2012.  She purchased one package for $13.99 and an additional package at a sale price.  Plaintiff Arentzen saw and read the representations on Citracal SR label prior to and at the time of purchase, and understood them as a representation and warranty by Bayer that Citracal SR provided efficient absorption of an entire day's recommended level of calcium in one serving or dose and that the product would the provide an equivalent amount of calcium to other products which require two daily doses.  She relied on these representations and warranties in deciding to purchase Citracal SR, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased Citracal SR if she had known that it would not, in fact, provide efficient absorption of an entire day's recommended level of calcium in one serving or dose and that Citracal SR would not provide an amount of calcium equivalent to that provided by other products which require two daily doses.  She also understood that in making the sale, the retailer was acting with the knowledge and approval of Bayer and/or as the agent of Bayer.  Furthermore, Plaintiff Arentzen was injured because she paid a premium price for the slow release feature of Citracal SR over comparable twice a day products that provide greater levels of bioavailable calcium.   In return, she received an ineffective and worthless product which did not provide her with a full day's supply of calcium in one daily dose and did not, when used as directed, provide an amount of absorbable calcium comparable to other twice-daily calcium supplements.  The amount of the price premium can be reasonably quantified by an appropriate market study of the prices for comparable calcium

6

supplements, or through a contingent valuation study, or through other means regularly employed by economic and valuation experts.

8.    Defendant Bayer HealthCare, LLC is a New York limited liability company and is a subsidiary of the German holding company Bayer, AG.  Bayer's Consumer Care Division of Bayer HealthCare LLC ("Consumer Care") specializes in over-the-counter ("OTC") products including supplements and nutritionals such as Citracal, Supradyn, One A Day, Berocca and Redoxon, antacids such as Talcid, and cough-and-cold products such as Alka-Seltzer Plus and White & Black.  In 2007, Bayer announced that its Consumer Care segment had acquired the over-the-counter calcium supplement brand Citracal from Mission Pharmacal.  At the time, it was reported that Citracal saw net sales of $47 million in 2007.  The Consumer Care Division typically sells its products through retail pharmacies, although supermarket chains and other large retailers are also significant distributors.  Bayer's Consumer Care Division is headquartered in Morristown, New Jersey.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 prospective class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one prospective class member is a citizen of a state different from Defendant.

10.    Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.  Plaintiffs are citizens of New Jersey who purchased Citracal SR from a retail store in this District, the Consumer Care Division of Defendant Bayer maintains its headquarters in this District, and Defendant distributed, advertised, and sold Citracal SR, which is the subject of the present complaint, in this District.

## FACTS COMMON TO ALL CLAIMS

**A.    The Market For Calcium Supplements**

11.    Calcium is most abundant mineral in the body.  It is found in some foods, added to others, available as a dietary supplement and present in some medicines (such as antacids). Calcium is required for vascular contraction and vasodilation, muscle function, nerve transmission, intracellular signaling, and hormonal secretion, though less than 1% of total body calcium is needed to support these critical metabolic functions.  Serum calcium is very tightly regulated and does not fluctuate with changes in dietary intakes.  Instead, the body uses bone tissue as a reservoir for, and source of calcium, to maintain constant concentrations of calcium in blood, muscle, and intercellular fluids.  Thus, if for any reason the body does not have enough calcium in the blood, it will leach calcium from stores in the bones to make up the difference.

12.    The remaining 99% of the body's calcium supply is stored in the bones and teeth where it supports their structure and function.  Bone itself undergoes continuous remodeling, with constant resorption and deposition of calcium into new bone.  The balance between bone resorption and deposition changes with age.  Bone formation exceeds resorption in periods of growth in children and adolescents, whereas in early and middle adulthood both processes are relatively equal.  In aging adults, particularly among postmenopausal women, bone breakdown exceeds formation, resulting in bone loss that increases the risk of osteoporosis over time.[1]

13.    The "Harvard Medical School Family Health Guide" explains that human bone is continually in the process of breaking down and building up.  During childhood, the building up exceeds the breaking down and bones increase in size, weight and density.  This continues until a

---

[1]    Osteoporosis is defined as a porous bone condition.  Osteoporosis can occur when bone is not built up at the same rate at which it is broken down and when insufficient levels of calcium in the blood cause calcium to be taken from the bone.

person is fully grown, at which point the two processes balance out. Later in life, after age 35 or so, bone loss can occur when the breaking down outpaces the building up.

14.     The pace of losing bone and bone density increases with age. Gradual bone loss begins in adulthood and becomes more serious after age 50. With age, the bones naturally lose mass, becoming more brittle and more porous. Most notably, in women, the hormonal changes of menopause – and the drop in estrogen levels that occur with it –– can greatly worsen the imbalance. Thus, the people at highest risk of a calcium deficiency are postmenopausal women.

15.     According to the "Diet and Nutrition Sourcebook," women experience their greatest depletion of bone in the initial five years following menopause. The Mayo Clinic warns that women are particularly vulnerable to breaking bones in their hip, back, or wrist after menopause. Each year in the United States, osteoporosis is thought to be responsible for 675,000 to 750,000 broken hips in women over age 50. Older adults who get sufficient amounts of calcium significantly lower their risk of breaking bones.

16.     Since calcium cannot be manufactured by the body, it is important to get enough of this important mineral through proper nutrition. For individuals who do not obtain enough calcium from foods, dietary supplements are required to meet calcium intake guidelines. This is particularly important, as evidence suggests that the average consumer does not meet the lower end of the recommended daily calcium intake.[2]   The national Osteoporosis Foundation recommends a daily calcium intake of 1,000 to 1,200 mg for adults and 1,500 mg for postmenopausal women.

17.     Calcium supplements have become the number one dietary supplement in the U.S. Millions of Americans take them. In recent years, sales of calcium supplements have

_____

[2]     In fact, patients with osteoporosis are more likely to have a history of inadequate dietary calcium intake.

grown to more than $175 million in domestic annual sales. The aging of the baby boomer generation is a major factor contributing to this increase.

**B.    Regulation Of Dietary Supplements**

18.    OTC drugs are regulated under the Federal Food, Drug, and Cosmetic Act ("FDCA"). Before a company can sell an OTC drug, the company must submit an extensive new drug application ("NDA").

19.    This NDA must contain "[E]vidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof." 21 U.S.C. § 355. Upon receipt of an NDA, the FDA evaluates whether each new drug is safe, effective and not mis-branded. Since the FDA must approve the labeling of OTC drugs, after the FDA approves a new drug application, any change in the drug's labeling requires a supplement to the application, and further approval by the FDA, either before or after the change.

20.    In contrast, "dietary ingredients" like calcium are subject to the Dietary Supplement Health and Education Act of 1994 ("DSHEA"). Under the DSHEA, the dietary supplement or dietary ingredient manufacturer – not the FDA – is responsible for ensuring that a dietary supplement or ingredient is safe before it is marketed. Generally, manufacturers do not need to register their products with FDA nor get FDA approval before producing or selling

dietary supplements.[3]  Moreover, manufacturers must make sure that product label information is truthful and not misleading, but do not need to submit these labels to the FDA for approval prior to marketing.

21.    Federal law allows for statements of nutritional support referring to representations about dietary supplement's effect on the structure or function of the body for maintenance of good health and nutrition – referred to as structure/function claims – without FDA authorization.  But structure/function claims are allowed only if the manufacturer has substantiation that the claim is truthful and not misleading, and also prominently displays the DSHEA disclaimer:    "This statement as not been evaluated by the Food and Drug Administration.  This product is not intended to diagnose, treat, cure, or prevent any disease."  Moreover, a structure/function claim may not "claim to diagnose, mitigate, treat, cure, or prevent a specific disease or class of disease."  21 U.S.C. § 343 (r)(6).

## C.    Citracal SR

22.    The original formulation of Citracal featured the salt calcium citrate, which was touted as providing superior bioavailability or better absorption in the stomach and gastrointestinal tract than other forms of calcium, including calcium carbonate.  According to Bayer:

> Because Citracal is water soluble, it can be absorbed with or without a meal.  Citracal can also be taken by people who are taking acid reducing agents such as proton pump inhibitors.  Calcium carbonate absorption, by contrast, is reduced in individuals with low stomach acid.

> * * *

> All of the previously mentioned forms of supplemental calcium have something in common:  They produce calcium ions when dissolved.  Calcium

---

[3]    Prior approval is only required where the supplement contains a "new dietary ingredient," *i.e.*, a dietary ingredient that was not sold in the U.S. in a dietary supplement before October 15, 1994.

citrate produces these ions when it reacts with water, and calcium carbonate gives off these ions when they react with stomach acid (hydrochloric acid). The calcium ions move into the small intestine, where they are actively absorbed into the body by passing through the cells in the intestinal wall. This is known as intracellular absorption.

Calcium citrate produces not one, but two different calcium delivery vehicles, and each of them uses a different path into the bloodstream. When dissolved, calcium citrate produces both calcium ions and a calcium citrate complex. The calcium ions are actively absorbed through the intestinal cells, and the calcium citrate complex actually passes between the cells. This is called paracellular absorption. Calcium citrate provides both intracellular and paracellular absorption. Citracal's high solubility and its dual absorption mechanism make it highly bioavailable.

23.    To this day, Bayer claims that their regular Citracal, containing only calcium citrate, "is the only one that is properly absorbed with or without food. No other brand can offer greater absorption."

24.    Although pharmacokinetic and pharmacodynamic studies[4] have shown substantially different levels of bioavailability of calcium from calcium carbonate and calcium citrate, studies have demonstrated the superior bioavailability[5] of calcium from calcium citrate by both serum and pharmacokinetic parameters. Specifically, one study found that serum calcium levels were significantly (94%) greater following dosing with calcium citrate as compared to calcium carbonate. *See* H.J. Heller, *et al.*, "Pharmacokinetic and Pharmacodynamic Comparison of two Calcium Supplements in Postmenopausal Women," *J. Clin. Pharmacol.* (Nov. 2000).

25.    Until 2011, Citracal's core products were traditional twice-a-day 500-600mg calcium supplements containing calcium citrate. One issue with such supplements, however,

---

[4]    *See* 7/31/2012, DrugStore.com Shopping Cart Webpage, annexed hereto as Exhibit A.

[5]    Bioavailability refers to the absorbability of calcium in the gastrointestinal tract.

was that consumers were required to take two doses over the course of the day in order to receive a full day's supply of calcium from these products.

26.    To address this problem, Bayer developed what it calls its "patent pending Slo-Cal™ Technology," which purportedly provides for the timed or extended release of calcium. Based on this technology, Bayer launched Citracal SR, an extended release calcium supplement in 2011.  Citracal SR was the first calcium supplement to offer 1,200 mg of calcium with a recommended once-daily serving or dosing.   In addition to once-daily dosing, Bayer touted that Citracal SR provides "unsurpassed absorption."

27.    As a result of these purported benefits, Bayer is able induce consumers to purchase Citracal SR over comparable twice-a-day calcium supplements, while extracting a substantial premium in the process.  The following table compares the pricing and recommended dosage of Citracal SR to its twice-a-day competitors:

| | Citracal Calcium +D  Slow Release 1200 | Nature Made Calcium with Vitamin D | Caltrate Calcium & Vitamin D | Os-Cal Calcium +D3 |
|---|---|---|---|---|
| **Manufacturer** | Bayer | Nature Made | Pfizer | GlaxoSmithKline |
| **Description** | 600 mg Caplets | 600 mg Tablets | 600 mg Tablets | 500 mg Caplets |
| **Suggested For Maximum Absorption  To Achieve Daily Recommended Value** | 2 caplets once per day | 1 tablet twice per day | 1 tablet twice per day | 1 caplet twice per day |
| **Caplets/Tablets in Retail Package** | 80 | 220 | 200 | 210 |
| **Cost Per Retail Package[6]** | $13.99 | $17.99 | $17.99 | $15.99 |
| **Cost Per Caplet/Tablet** | $0.17 | $.08 | $.09 | $.07 |
| **Cost For Daily Recommended Value (1,200 mg)** | **$0.35** | **$0.16** | **$0.18** | **$0.18** |

28.    As the table reveals, Bayer charges approximately twice the price for Citracal SR than its competitors charge for comparable products which provide calcium in a more bioavailable form through multiple daily doses.

**D.    Bayer's False And Misleading Marketing Campaign**

29.    Since 2011, Bayer engaged in a uniform marketing and advertising program designed to convince consumers that Citracal SR provides <u>efficient</u> and unsurpassed calcium absorption of 1,200 mg in just one daily dose.

30.    These material representations, which were designed to induce consumers to purchase Citracal SR in reliance upon these representations, were contained within the product name, in the name of the product's technology, in Bayer's own advertisements, on the packaging, in package inserts, and on Bayer's website.    These representations were also delivered to retailers in the form of marketing materials which were reprinted verbatim to consumers.

### 1.    <u>Citracal SR's False And Misleading Name</u>

31.    The name "Citracal Slow Release 1200" is false and misleading, as demonstrated by Bayer's own studies.   The name expressly or impliedly states that consumers will receive a slow release dose of 1,200 mg of calcium over the course of a day.

32.    However, Citracal SR does not provide continuous, efficient absorption of 1,200 mg or a full day's supply of a calcium, nor does a single dose of Citracal SR provide an equivalent (or greater) amount of calcium as compared to the current standard two daily servings or doses of competing calcium supplements.

33.    Similarly, the technology used to create Citracal SR, "Slo-Cal™ Technology," falsely and misleadingly implies that the product has the same characteristics, which it does not.

2.      **Citracal SR's False And Misleading Label**

34.     The label of Citracal SR represents that it is effectively and efficiently provides unsurpassed absorption of 1,200 mg of calcium in once-daily dosing.  For example, Defendant touts in numerous advertisements and/or directly on the products label that Citracal SR provides:

a)      "NEW Breakthrough for Unsurpassed Absorption."

b)      "Slowly & continuously releases calcium for efficient absorption."

c)      "Take just once daily."

d)      "Slo-Cal Technology is a breakthrough, patent-pending technology that has been specifically developed and recommended to provide <u>efficient</u> calcium absorption **in just one daily dose**.  This proprietary technology and formula can only be found in Citracal Slow Release 1200 and cannot be duplicated by any other brand" (emphasis in original).  "Yes!  New **Citracal Slow Release 1200** contains 1200 mg of calcium and 1000 IU of vitamin D3 in just one daily dose."

e)      "Research suggests that the best way to take calcium is in small easily absorbable amounts but most calcium supplements don't work this way.  **Citracal Slow Release 1200** contains Slo-Cal Technology, a patent pending technology which slowly releases the calcium for <u>efficient</u> absorption."

f)      "*And Because of the Slo-Cal Technology, you only have to take it once per day for your full daily dose*" (emphasis in original).

 

35.     As discussed in further detail below, each of these claims are false, misleading and likely to deceive the public because:  (i) Citracal SR is substantially less effective than competing supplements; (ii) Citracal SR's "slow-release" technology is fundamentally flawed because the body's calcium channels become saturated in the presence of continuous calcium, which produces an inhibitory feedback mechanism that actually prevents further uptake or absorption of calcium; and (iii) Citracal SR does not provide the recommended amount of calcium with one daily dose.

**3.     Citracal SR's False And Misleading Website**

36.     Bayer marketed Citracal to its target market on its website, maintained by Bayer. This website contained the following representations regarding Citracal SR:



## Citracal Slow Release 1200

About Citracal
Citracal Citrate Products
Maximum
Petites
Plus Magnesium
Regular
Slow Release 1200
Calcium Gummies
Plus Bone Density Builder





Studies show that calcium is best absorbed in small, continuous amounts. Most calcium supplements don't do that in one daily dose. Citracal Slow Release 1200 is the only calcium supplement† which slowly and continuously releases small amounts of calcium plus vitamin D3 for efficient absorption in just one daily dose.

**Product Benefits**

- Only needs to be taken once a day
- Efficient absorption with extended, continuous release from Slo-Cal™ Technology
- One serving provides 1200 mg of calcium (as citrate + carbonate blend) to help keep your bones strong*
- One serving contains magnesium plus 1000 IU of vitamin D3 to help your body absorb calcium*

† among leading brands



*See http://citracal.com/en/about-citracal/citracal-slow-release-1200/http://citracal.com/en/about-citracal/citracal-slow-release-1200/* (last visited July 31, 2012).

37.    Likewise, the frequently asked questions section of the Citracal website contains the following representations:

a)    "Citracal Slow Release works by slowly releasing small, easily absorbable amounts of calcium in order to provide efficient calcium absorption."

b)    "You only have to take 2 pills once a day to get your full day's worth of calcium." *See* http://citracal.com/en/faqs/index.php?id=1# (last visited July 31, 2012).

38.    As discussed in further detail below, each of these claims are false, misleading and likely to deceive the public because:  (i) Citracal SR is substantially less effective than competing supplements; (ii) Citracal SR's "slow-release" technology is fundamentally flawed because the body's calcium channels become saturated in the presence of continuous calcium, which produces an inhibitory feedback mechanism that actually prevents further uptake or

absorption of calcium; and (iii) Citracal SR does not provide the recommended amount of calcium with one daily dose.

### 4.    Citracal SR's False And Misleading Marketing Materials

39.    Bayer also prepared and provided uniform advertising copy to major retailers, such as Walmart and CVS, with the intent that such representations be used as point of sale literature on these companies' website.

40.    For example, Walmart's website contains the following description of Citracal SR, which is provided by Bayer:

> Calcium is very important for your body's health.  A good option to increase calcium intake is the Citracal with Calcium +D Slow Release 1200 80-count. This vitamin supplement uses the slo-cal technology, and it also includes vitamin D3.  Slo-cal is a patent-pending technology which slowly releases the calcium into your body for increased calcium absorption.  Thanks to this slow release technology, only a single daily dose is required.

*See      http://www.walmart.com/ip/Citracal-D-Slow-Release-1200-Calcium-Supplement 80ct/16816387http://www.walmart.com/ip/Citracal-D-Slow-Release-1200-Calcium-Supplement-80ct/16816387* (last visited July 31, 2012).

41.    Likewise, the CVS website states:

> Calcium Supplement.    Breakthrough for unsurpassed absorption.    Slo-Cal Technology.  Slowly & continuously releases calcium for efficient absorption. 1200 mg of calcium plus 1000 IU of vitamin D3.  Take just once daily.  How is Citracal Slow Release 1200 different from my current calcium product?  Research suggests that the best way to take calcium is in small, easily absorbable amounts but most calcium supplements don't work this way.  Citracal Slow Release 1200 contains Slo-Cal Technology, a patent-pending technology which slowly releases the calcium for efficient absorption.  And because of the Slo-Cal Technology, you only have to take it once per day for your full daily dose.  What is Slo-Cal Technology?  Slo-Cal Technology is a breakthrough, patent-pending technology that has been specifically developed and researched to provide efficient calcium absorption in just one daily dose.  This proprietary technology and formula can only be found in Citracal Slow Release 1200 and cannot be duplicated by any other calcium brand.  Does this product contain the calcium and vitamin D I need for strong bones?  Yes!  New Citracal Slow Release 1200 contains 1200 mg of calcium plus 1000 IU of vitamin D3 in just one daily dose.

*See http://www.cvs.com/shop/product-detail/Citracal-Slow-Release-Calcium-D-Coated-Tablets?skuId=843999http://www.cvs.com/shop/product-detail/Citracal-Slow-Release-Calcium-D-Coated-Tablets?skuId=843999* (last visited July 31, 2012).

42.     Moreover, the website for Drugstore.com reprints each of the statements on the Citracal SR product label described above.  *See* DrugStore.com Citracal Slow Release Product Page, Product Details Tab, located at *http://www.drugstore.com/citracal-calcium-d-slow-release-1200-coated-tablets/qxp346860?catid=183252* (last visited July 31, 2012).

43.     In addition, Bayer disseminated advertisements, both on its website and in national publications directed at its target market promoting the same message.  For example, one such advertisement reads:  "INTRODUCING CITRACAL® Slow Release 1200:  The only calcium supplement taken just once daily."  These advertisements included representations that Bayer's "Slo-Cal™ Technology releases calcium continuously for efficient absorption."



*See http://www.citracalpro.com/static/documents/pdf/CITR_42383_M03_ROB_Asize.pdf* (last visited July 31, 2012).

44.    As discussed in further detail below, each of these claims are false, misleading and likely to deceive the public because:  (i) Citracal SR is substantially less effective than competing supplements; (ii) Citracal SR's "slow-release" technology is fundamentally flawed because the body's calcium channels become saturated in the presence of continuous calcium, which produces an inhibitory feedback mechanism that actually prevents further uptake or absorption of calcium; and (iii) Citracal SR does not provide the recommended amount of calcium with one daily dose.

**E.    Bayer's Advertising For Citracal SR Is False And Misleading**

45.    Despite claiming to provide a "New Breakthrough for unsurpassed absorption," Citracal SR uses calcium carbonate, which is a far less effective (and cheaper) form of calcium than calcium citrate.  As Bayer boasts on its website, "Calcium citrate provides both intracellular and paracellular absorption," which "make it highly bioavailable."   However, "[c]alcium carbonate absorption, by contrast, is reduced in individuals with low stomach acid."

46.    Moreover, despite claiming that Citracal SR provides "unsurpassed absorption," the human body cannot effectively absorb Citracal SR.  This is because the human body's calcium channels become saturated in the presence of continuous calcium, which triggers an inhibitory feedback mechanism that actually *prevents* absorption.  Bayer's own study, discussed below, proves that Citracal SR fails to meet the Bayer's promises that the product is effective as a once-a-day calcium supplement.

47.    Citracal SR does not provide a full day's worth of calcium in one dose because, while 1,200 mg of calcium is a daily dose of calcium and the recommended dosage of Citracal SR is 1,200 mg, the body does not and cannot absorb the 1,200 mg of calcium in Citracal SR.  Citracal SR is ineffective for its intended purposes.  It has no value.  It is worthless.

1.      **Citracal SR Primarily Contains Calcium Carbonate, Which Is A Cheaper And Substantially Less Effective Form Of Calcium**

48.     In nature, calcium is found only in combination with another substance, such as carbonate, citrate, or phosphate.  These compounds are called calcium salts, and they vary in the amount of elemental calcium they contain.  Although there are there are many different varieties of calcium compounds available, the two main forms of calcium in supplements are calcium carbonate and calcium citrate.

49.     Calcium must be in a soluble form, generally ionized before it can be absorbed by the gastrointestinal tract.  Because calcium citrate produces calcium ions when it reacts with water (water soluble), calcium citrate can be taken at any time of the day, irrespective of meals.  In contrast, calcium carbonate produces calcium ions when they react with stomach acid (hydrochloric acid).  In other words, due to its dependence on stomach acid for absorption, calcium carbonate is absorbed most efficiently when taken with food.  Although pharmacokinetic and pharmacodynamic studies[7] have shown substantially different levels of bioavailability of calcium from calcium carbonate and calcium citrate, these studies have demonstrated the superior bioavailability of calcium from calcium citrate by both serum and pharmacokinetic parameters.

50.     For example, a 1999 study by Heller, *et al*. compared the absorption of calcium carbonate versus calcium citrate in 18 postmenopausal normal women.  *See* H.J. Heller, *et al.*,

---

[7]      Pharmokinetic studies (commonly referred to as "PK studies") examine the way the body uses a drug.  Pharmokinetics includes the study of the mechanisms of absorption and distribution of an administered drug, the rate at which a drug action begins and the duration of the effect, the chemical changes of the substance in the body and the effects and routes of excretion of the metabolites of the drug.  In contrast, Pharmodynamic studies examine the effect of a drug on the body.  Pharmacodynamics include the study of the biochemical and physiological effects of drugs on the body, the mechanisms of drug action, and the relationship between drug concentration and effect.

"Pharmacokinetics of Calcium Absorption from two Commercial Calcium Supplements," *J. Clin. Pharmacol.* (Nov. 1999).  The authors found that absorption "was 2.5-fold greater for [calcium citrate] than [calcium carbonate], and the peak-basal variation in serum calcium was 76% higher for [calcium citrate] than [calcium carbonate]." *Id.*  The authors concluded that calcium citrate "is much more bioavailable" than calcium carbonate.  *Id.*

51.    Similarly, a 2000 study by Heller, *et al*. compared the absorption of calcium carbonate versus calcium citrate in 25 postmenopausal women.   *See* H.J. Heller, *et al*., "Pharmacokinetic and Pharmacodynamic Comparison of two Calcium Supplements in Postmenopausal Women," *J. Clin. Pharmacol.* (Nov. 2000).  The authors found that, "Compared with calcium carbonate, calcium citrate provided a 46% greater peak-basal variation and **94% higher** change in area under the curve for serum calcium and a 41% greater increment in urinary calcium." *Id.* (emphasis added).  They concluded that "calcium citrate is more bioavailable than calcium carbonate when given with a meal." *Id.*

52.    As a result, calcium citrate is generally considered the most absorbable form of calcium.  Calcium citrate, however, is significantly more expensive than calcium carbonate.

53.    Most forms of Citracal contain only calcium citrate, the superior form of calcium (thus the name **Citra**cal).  This includes Citracal Regular, Citracal Maximum, Citracal Gummies, Citracal Petite, and Citracal Plus Magnesium.

54.    But Citracal SR is a break from tradition.  It primarily contains calcium carbonate, which is the cheaper and less effective form of calcium.  It is less bioavailable – and less effective – than competing calcium supplements, including other varieties of Citracal.

55.    Therefore, Citracal SR is defective and does not provide 1,200 mg of calcium in a single does because it contains an inferior form of calcium that has lower absorption rates and

lower bioavailability when compared to other calcium supplements, including other varieties of Citracal.

### 2. The Design Of Citracal SR Is Fundamentally Flawed Because The Human Body's Calcium Channels Prevent The Absorption Of Slow-Release Calcium

56.    After a certain amount of calcium is absorbed in the intestine, the human body triggers an inhibitory feedback mechanism that prevents further uptake. Stated otherwise, the percentage of calcium absorbed depends on the total amount of elemental calcium consumed at one time – as the amount increases, studies have shown the percentage absorption decreases. *See, e.g.,* New York Department Of Health, *All About Calcium Supplements*, http://www.health.ny.gov/diseases/conditions/osteoporosis/calcium_supplements.htm ("It is also important not to consume too much calcium at one time. For the most efficient calcium absorption, it is best to consume calcium (from food and/or supplements) in amounts of 600mg or less at one time. Your body uses calcium best when it is spread out through the day.").

57.    As a result, it is well-established that calcium absorption is highest in doses of 500 mg or less. To maximize absorption, a person who requires 1,000 mg per day of calcium splits the dose and takes two 500 mg doses at separate times. By doing so, the calcium is absorbed in a narrow "window" of time, before the body's inhibitory feedback mechanism is triggered. *See, e.g.,* Harvard Health Letter, *What You Need To Know About Calcium*, Apr. 2003, http://www.health.harvard.edu/newsweek/What_you_need_to_know_about_calcium.htm ("Calcium supplements usually come in 500- to 600-mg tablets. You don't absorb large doses of calcium as efficiently as you do small ones. Thus, much of a 1,000-mg tablet is going to waste…").

58.    Citracal SR is a fundamentally flawed product because the body's inhibitory feedback mechanism is maintained by the exposure of continuous calcium. That is, products like

Citracal SR unnecessarily maintain the absorption capabilities of the intestine in the "off" position, such that little to no calcium is actually absorbed.

59.    Thus, Citracal SR has an inherently flawed design.    Slow-release calcium supplements like Citracal SR are simply ineffective.    A single dose of Citracal SR is not equivalent to two doses of competing calcium supplements.

**3.    Bayer's Own Study Proves That Citracal SR Is Substantially Less Effective Than Competing Supplements**

60.    As part of its marketing efforts, Bayer commissioned a Pharmacokinetic Study ("PK Study") regarding the efficacy of Citracal SR.    The PK Study compared Citracal SR to competing supplements, and it examined whether the product delivers the recommended daily amount of calcium in a single dose when compared to two doses of 600 mg.

61.    Ironically, Bayer's PK Study demonstrates that its own marketing claims are false and misleading.    Specifically, the PK Study proves that Citracal SR is ineffective and delivers substantially less bioavailable calcium than competing supplements.

62.    On June 29, 2012, the National Advertising Division ("NAD"), an investigative unit of the advertising industry's self-regulatory system administered by the Council of Better Business Bureau, issued a report concerning Bayer's PK Study.    NAD Case #5478 Report (the "NAD Report").    The NAD Report stated:    "The adjusted data does not show bioequivalence" between Citracal SR and the competitor's products tested, and the authority cited by Bayer "contradicts the advertiser's position with respect to reliance on the unadjusted data."    NAD Report at 19-20.

63.    Indeed, Bayer misrepresented the results of its PK Study.    Specifically, Bayer only reported the *unadjusted* results, which measures the *total* blood serum levels of calcium. However, measuring the *total* blood serum of calcium is inaccurate because Bayer allowed study

participants to consume up to 1,000 mg of calcium prior to the study, which is abnormally high for similar calcium studies. In fact, "properly designed pharmacokinetic studies of calcium absorption provide for a daily calcium intake of no more than 500 mg during the treatment period." *Id.* at 17. This abnormality has the potential to skew results, as "an individual ingesting up to 1000 mg of calcium per day would not need a calcium supplement, and will actually absorb less calcium from a supplement." *Id.*[8]

64.    However, *adjusted* calcium levels (*i.e.*, the overall change in calcium) are a more accurate measurement because it is "able to isolate the calcium contributed from the supplement itself." *Id.* at 18. The NAD found that "the adjusted data *failed to show bioequivalence*." *Id.* (emphasis added). In other words, the adjusted calcium levels reported by Bayer's PK Study plainly indicates that Citracal SR is *less effective* at raising calcium in the blood than competing supplements.

65.    Furthermore, as a secondary measurement, Bayer's study also examined the levels of intact parathyroid hormone ("iPTH"). The hormone iPTH is inversely correlated with calcium because its concentration falls when there is an increase in calcium. Stated otherwise, iPTH levels are low when calcium is high, and vice versa. In practice, doctors often order calcium tests along with iPTH tests.

66.    Indeed, *adjusted* iPTH levels (*i.e.,* the overall change in iPTH) corroborates that Citracal SR is less effective than raising calcium than competing supplements: "the baseline-

---

[8]    For more information about adjusted versus unadjusted calcium measurements, *see generally* S. Dissanayake, S., "Assessing the Bioequivalence of Analogues of Endogenous Substances ("Endogenous Drugs"): Considerations to Optimize Study Design," *Br. J. Clin. Pharmacol.* (Mar. 2010). The NAD wrote that, "[Dissanayake's] article then concludes that 'baseline correction [adjusted values] *should be routinely employed*, except in rare cases where substantial increases over baseline endogenous levels may limit the need for this' – *an exception which does not apply here*." (emphasis added).

corrected [adjusted] data for iPTH … *shows no bioequivalence* in 2 of the 3 comparisons," and "the third comparison which did demonstrate bioequivalence was to the Os-Cal supplement, which was a 500 mg dose (the other two supplements were 600 mg doses)." *Id.* at 19. That is, study participants who took Citracal SR experienced a smaller decrease in iPTH than the other groups. This means that participants who took Citracal SR absorbed less calcium than the groups who took competing supplements.

67. The results of the PK Study are clear: Citracal SR fails to raise calcium levels as effectively as competing calcium supplements, and it is ineffective as a once-a-day calcium supplement. This conclusion is supported by the PK Study's data for adjusted calcium levels, and it is corroborated by the data for adjusted iPTH.

**F.    Bayer's False And Misleading Representations Cause Harm To Consumers**

68. Consumers rely upon Citracal's labeling that it is effective as a once-daily calcium supplement. These representations and warranties are part of the basis of the bargain, in that consumers would not purchase Citracal SR if they knew these representations were false or misleading. Indeed, Citracal SR is sold for approximately twice the price of comparable calcium supplement products – if consumers knew it was not effective as a once daily supplement, there would be no reason to pay more for the product. Moreover, they would not be inclined to take the supplement only once daily, as directed by Bayer, if they knew that a substantial portion of the dose could not be absorbed by their bodies.

69. Defendant's practices are undetectable to the reasonable consumer. A reasonable consumer does not have the equipment and knowledge to conduct her own efficacy studies of Citracal SR. She reasonably believes that by taking Citracal SR as directed by Bayer, she is receiving 1,200 milligrams of calcium per day from the supplement. In fact, she is receiving less

absorbable calcium than her bones require on a daily basis, and less calcium at a greater cost than she would receive if she were using a competitor's product.

70.    As a direct and proximate cause of Defendant's conduct, Plaintiffs and Class members have been injured and harmed because:  (a) they would not have purchased Citracal Slow Release on the same terms if the true facts concerning its performance were known; (b) they paid a price premium for Citracal SR due to its supposed status as a once-a-day calcium supplement; and (c) Citracal SR did not have the quality, functionality, or value as promised. The amount of the price premium can be reasonably quantified by an appropriate market study of the prices for comparable calcium products, or through a contingent valuation study, or through other means regularly employed by economic and valuation experts.

## CLASS ACTION ALLEGATIONS

71.    Plaintiffs bring this class action pursuant to Fed. R. Civ. P. 23 (a), (b)(1), (b)(2), and (b)(3) on behalf of all purchasers of Citracal SR in the United States (the "Class").

72.    Plaintiffs also seek to represent a subclass defined as all members of the Class who purchased Citracal SR in New Jersey ("the New Jersey Subclass").

73.    Members of the Class and the New Jersey Subclass are so numerous that their individual joinder herein is impracticable.  Members of each of these classes number in the thousands.  The precise number of Class members and their identities are unknown to Plaintiffs at this time but will be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Bayer and third party retailers and vendors.

74.    Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

a)      whether Bayer was unjustly enriched by its conduct;

b)      whether Bayer breached any express or implied warranties made to Plaintiffs and the Class concerning the ability of Citracal SR to enable consumers to efficiently absorb the calcium in a single daily dose;

c)      whether Bayer advertises, or markets Citracal SR in a way that is false or misleading;

d)      whether Citracal SR fails to conform to the representations, which were published, disseminated and advertised to Plaintiffs and the Class;

e)      whether, by the misconduct set forth in this Complaint, Bayer has engaged in unfair, fraudulent or unlawful business practices with respect to the advertising, marketing and sales of Citracal SR;

f)      whether Bayer violated New Jersey Consumer Fraud Act;

g)      whether Class members suffered an ascertainable loss as a result of the Bayer's misrepresentations; and

h)      whether, as a result of Bayer's misconduct as alleged herein, Plaintiffs and Class members are entitled to restitution, injunctive and/or monetary relief and, if so, the amount and nature of such relief.

75.      Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Bayer's wrongful conduct.  Plaintiffs have no interests antagonistic to the interests of the other members of the Class.  Plaintiffs and all members of the Class have sustained economic injury arising out of Bayer's violations of common and statutory law as alleged herein.

76.    Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seek to represent, they have retained counsel competent and experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

77.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Bayer's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Bayer's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

### COUNT I
**(Violation Of The New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq.*)**

78.    Plaintiffs and Class members reallege and incorporate by reference each allegation set forth above and further allege as follows.

79.    Plaintiffs bring this claim on behalf of the New Jersey Subclass under New Jersey law.

80.    Bayer made misrepresentations about Citracal SR to consumers, including but not limited to:  1) the representation that Citracal SR can provide 1,200 mg of calcium in a single

daily dose; and 2) the representation that Citracal SR provides the same level of calcium or more as competing calcium supplements that require two daily doses.

81.    Defendant engaged in an unconscionable commercial conduct because these misrepresentations were based on junk science and false interpretation of the results of Citracal's own study.

82.    Plaintiffs and Class members suffered an ascertainable loss caused by Bayer's misrepresentations because:  (a) they would not have purchased Citracal SR on the same terms if the true facts concerning their ability to provide consistent levels of Calcium had been known; and (b) they paid a price premium due to the mislabeling of Citracal SR and (c) Citracal SR did not have the quality, functionality or value as promised.

83.    Defendants' dissemination of these misrepresentations in order to sell more of its product were actuated by actual malice and/or accompanied by a wanton and willful disregard of harm to Plaintiffs and the Class members.

**COUNT II**
**(Unjust Enrichment)**

84.    Plaintiffs and Class members reallege and incorporate by reference each allegation set forth above and further allege as follows.

85.    Plaintiffs bring this claim individually and on behalf of the members of the Class and the New Jersey Subclass against Defendant Bayer.

86.    "Although there are numerous permutations of the elements of the unjust enrichment cause of action in the various states, there are few real differences.  In all states, the focus of an unjust enrichment claim is whether the defendant was *unjustly* enriched.  At the core of each state's law are two fundamental elements – the defendant received a benefit from the plaintiff and it would be inequitable for the defendant to retain that benefit without compensating

the plaintiff.  The focus of the inquiry is the same in each state." *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 58 (D.N.J. 2009), *quoting Powers v. Lycoming Engines*, 245 F.R.D. 226, 231 (E.D. Pa. 2007).

87.     "Since there is no material conflict relating to the elements of unjust enrichment between the different jurisdictions from which class members will be drawn," *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. at 58, New Jersey law applies to those claims.

88.     Plaintiffs and Class members conferred a benefit on Bayer by purchasing Citracal SR.

89.     Bayer has been unjustly enriched in retaining the revenues derived from Class members' purchases of Citracal SR, which retention under these circumstances is unjust and inequitable because Bayer misrepresented that Citracal SR provides 1,200 mg of absorbable calcium in a single daily dose and provides the same level of calcium as competing calcium supplements that require two daily doses.  In fact Citracal SR could not supply the same levels of calcium as represented, which caused injuries to Plaintiffs and Class members because: (a) they would not have purchased Citracal SR on the same terms if the true facts concerning their ability to provide consistent levels of Calcium had been known; and (b) they paid a price premium due to the mislabeling of Citracal SR and (c) Citracal SR did not have the quality, functionality or value as promised.

90.     Because Bayer's retention of the non-gratuitous benefit conferred on it by Plaintiffs and Class members is unjust and inequitable, Bayer must pay restitution to Plaintiffs and the Class members for its unjust enrichment, as ordered by the Court.

## COUNT III
### (Breach Of Express Warranty)

91.    Plaintiffs and Class members reallege and incorporate by reference each allegation set forth above and further allege as follows.

92.    Plaintiffs bring this claim individually and on behalf of the members of the Class and the New Jersey Subclass under New Jersey law against Defendant Bayer.

93.    Bayer, as the designer, manufacturer, marketer, distributor, or seller expressly warranted Citracal SR provides 1,200 mg of absorbable calcium in a single daily dose and provides the same level of calcium as competing calcium supplements that require two daily doses.

94.    Bayer made these representations in the product name, the product packaging, on its website and in its advertisements and disseminated the information to third party retailers for use in promoting the product.

95.    In fact, when used as directed, Citracal SR does not and cannot provide 1,200 mgs of absorbable calcium or the same level of calcium as competing calcium supplements that require two daily servings or doses.

96.    Plaintiffs and Class Members were injured as a direct and proximate result of Bayer's breach because:  (a) they would not have purchased Citracal SR on the same terms if the true facts concerning its ability to provide consistent levels of Calcium had been known; (b) they paid a price premium due to the mislabeling of Citracal SR and (c) Citracal SR did not have the quality, functionality or value as promised.

## COUNT IV
### (Breach Of Implied Warranty Of Merchantability)

97.    Plaintiffs and Class members reallege and incorporate by reference each allegation set forth above and further allege as follows.

98.     Plaintiffs bring this claim individually and on behalf of the members of the Class and the New Jersey Subclass under New Jersey law against Defendant Bayer.

99.     Defendant as the designer, manufacturer, marketers, distributors, and/or sellers impliedly warranted that Citracal SR was fit for its intended purpose in that it would provide efficient absorption of an entire day's recommended level of calcium in one serving or dose.

100.    Defendant breached the warranty implied in the contract for the sale of Citracal SR because it could not pass without objection in the trade under the contract description, the goods were not of fair average quality within the description, the goods were unfit for their intended and ordinary purpose, and the goods do not conform to the promises or affirmations of fact made on the container or label because Citracal SR does not provide continuous, efficient absorption of 1,200 mg of calcium, nor does a single serving or dose of Citracal SR provide an equivalent (or greater) amount of calcium as compared to the current standard two daily servings or doses of competing calcium supplements.  As a result, Plaintiffs and Class members did not receive the goods as impliedly warranted by Defendant to be merchantable.

101.    Citracal SR was not altered by Plaintiffs or Class members.

102.    Citracal SR was did not conform to the implied warranties of merchantability when it left the exclusive control of Defendant.

103.    Defendant knew that Citracal SR would be purchased and used without additional testing by Plaintiffs and Class members.

104.    As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiffs and Class members have been injured and harmed because:  (a) they would not have purchased Citracal SR on the same terms if the true facts concerning its performance were known; (b) they paid a price premium for Citracal SR due to its supposed status as a once-a-day

calcium supplement; and (c) Citracal SR did not have the quality, functionality, or value as promised.

       **WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Bayer, as follows:

       A.      For an order certifying the nationwide Class and the New Jersey Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as Class Representatives and their attorneys as Class Counsel to represent the Class members;

       B.      For an order declaring the Bayer's conduct violates the statutes referenced herein;

       C.      For an order finding in favor of the Plaintiffs, the nationwide Class and the New Jersey Subclass on all counts asserted herein;

       D.      For an order awarding compensatory, treble, and punitive damages in amounts to be determined by the Court and/or jury;

       E.      For prejudgment interest on all amounts awarded;

       F.      For an order of restitution and all other forms of equitable monetary relief;

       G.      For injunctive relief as pleaded or as the Court may deem proper; and

       H.      For an order awarding Plaintiffs and the Class and subclasses their reasonable attorneys' fees and expenses and costs of suit.

                                         CARELLA, BYRNE, CECCHI,
                                       OLSTEIN, BRODY & AGNELLO
                                       Attorneys for Plaintiffs

                                       By: /s/ James E. Cecchi
                                          JAMES E. CECCHI

Dated: March 13, 2013

Antonio Vozzolo                               Scott A. Bursor
Courtney E. Maccarone                 Joseph I. Marchese
FARUQI & FARUQI, LLP                BURSOR & FISHER

369 Lexington Avenue, 10th Floor
New York, New York  10017
(212) 983-9330

888 Seventh Avenue
New York, New York  10019
(212) 989-9113

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims so triable.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
Attorneys for Plaintiffs

By:    /s/ James E. Cecchi
      JAMES E. CECCHI

Dated:  March 13, 2013

Antonio Vozzolo
Courtney E. Maccarone
FARUQI & FARUQI, LLP
369 Lexington Avenue, 10th Floor
New York, New York  10017
Tel:  (212) 983-9330

Scott A. Bursor
Joseph I. Marchese
BURSOR & FISHER
888 Seventh Avenue
New York, New York  10019
Tel:  (212) 989-9113